RANDY S. GROSSMAN
United States Attorney
NICHOLAS W. PILCHAK
California Bar No. 331711
MEGHAN E. HEESCH
Minnesota Bar No. 0395912
ERIC R. OLAH
California Bar No. 295513
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619)546-9709
Email: nicholas.pilchak@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: | 22-CR-1152-BAS |
|---|---|---|
| Plaintiff, | Date: | October 3, 2022 |
|  | Time: | 3:00 p.m. |
| v. | Honorable Cynthia Bashant | |
| KARIM ARABI (1),<br>SANJIV TANEJA (3),<br>ALI AKBAR SHOKOUHI (4), | **THE UNITED STATES' MOTION FOR PROTECTIVE ORDER PURSUANT TO RULE 16 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE** | |
| Defendants. | | |

The United States of America, by and through its counsel, RANDY S. GROSSMAN, United States Attorney, and Nicholas W. Pilchak, Meghan E. Heesch, and Eric R. Olah, Assistant U.S. Attorneys, respectfully moves for a protective order governing the production and Defendants' dissemination of discovery in this case pursuant to Rule 16(d) of the Federal Rules of Criminal Procedure. A copy of the United States' proposed protective order (the "Proposed Order") is attached as Exhibit 1. As set out in this motion, good cause exists for the proposed protective order.

# I.

## STATEMENT OF THE CASE

On May 24, 2022, a federal grand jury in the Southern District of California returned an 8-count indictment charging Defendants Karim Arabi ("Karim"), Sheida Alan, aka Sheida Arabi ("Sheida"), Sanjiv Taneja and Ali Akbar Shokouhi with wire fraud conspiracy, various related crimes, and criminal forfeiture. ECF 1. The grand jury returned a superseding indictment on July 19, 2022, adding factual allegations to Count 6 and certain allegations pertaining to criminal forfeiture. ECF 9. On August 9, 2022, Karim, Taneja and Shokouhi (collectively, the "arraigned defendants") were all arrested in the United States pursuant to arrest warrants issued in connection with the indictment. Sheida was provisionally arrested by Canadian authorities the same day and is pending extradition from Canada. All defendants have been released on bail.

Within days of the arrests, the United States tendered proposed protective orders to the arraigned defendants via their counsel.[1] Despite extensive discussions, the parties have been unable to agree on a proposed provision prohibiting the arraigned defendants' disclosure of discovery materials to Sheida or her counsel prior to Sheida's arraignment before this Court. The United States believes that the remaining provisions in the proposed protective order are agreeable to all parties, although it understands that the defense may object to a temporary "Attorney's Eyes Only" designation for any discovery, including a limited set of materials which the United States believes are particularly sensitive.

Because the parties have been unable to agree on a protective order for these reasons, the United States files the instant motion.

---

[1]  No attorney for Sheida has entered an appearance in this case. In Shokouhi's case, the proposed order was first supplied to his original counsel, who were then specially appearing. The order was later supplied to current counsel, who have taken the positions described in this motion.

## II.
## STATEMENT OF FACTS

### A. The Charged Crimes.

Briefly, the crimes charged in this case involved a scheme to defraud Qualcomm Technologies, Inc., referred to as the Victim Company in the indictment, in connection with Qualcomm's purchase of new tech company Abreezio LLC for $150 million.[2] Because Karim was a Qualcomm employee whose employment agreements would have allowed his employer to make its own legal claim on any technology he developed, all defendants carefully hid Karim's role, and instead described Abreezio's new technology as the invention of Karim's sister, Sheida. Based on the fraud, Qualcomm paid $150 million to Sheida, Taneja, Shokouhi's companies, and others. The defendants then proceeded to launder the proceeds of the fraud via international money transfers, stock and real estate investments, and other means.

### B. The Civil Fraud Lawsuit.

In 2017, Qualcomm filed a civil fraud suit against Karim, Sheida and Taneja, arising out of the Abreezio transaction. As part of the suit, the parties exchanged a substantial amount of discovery, virtually all of which was covered by a detailed protective order providing layered restrictions on its use and designation. Counsel for all sides designated certain materials as "Highly Confidential – Attorneys' Eyes Only," including roughly 783 documents produced by Qualcomm totaling approximately 10,000 pages. In anticipation of producing those records to the arraigned defendants in this case, counsel for Qualcomm is presently conducting a detailed review of those records to determine which (if any) may still justify heightened protections.

### C. The Extensive Discovery.

Anticipated discovery in this case is extraordinarily voluminous. In connection with the arrests, the United States prepared an initial round of discovery totaling

---

[2] This is a summary statement of facts for purposes of this motion only. The United States reserves the right to supplement it at a later time.

approximately 270,000 pages, which it planned to produce as soon as a protective order was entered. A second (and even larger) round of discovery is being prepared for further production. It is presently unknown how large discovery will ultimately be, in part because the investigation is ongoing and new material is still being collected.

The discovery processed thus far includes:

- Detailed financial information, including bank records, from dozens of domestic and foreign accounts used by the arraigned defendants, Sheida, and several other individuals;
- Personal identifiable information ("PII") from a variety of sources, including identification documents and material from government, criminal and immigration databases for the arraigned defendants, Sheida, and several other individuals;
- U.S. federal tax information for several individuals, including certain defendants;
- Tens of thousands of email messages from warrant searches and civil discovery, involving accounts used by the arraigned defendants, Sheida, and several other individuals;
- Business records involving the arraigned defendants, Sheida, and several other individuals;
- Internal business records from Qualcomm, including internal correspondence, sensitive and confidential business information, and financial information; and
- Extensive discovery from the civil fraud suit filed by Qualcomm against Karim, Sheida and Taneja, virtually all of which was itself subject to a civil protective order, and a small fraction of which was designated "Attorney's Eyes Only."[3]

---

[3]  In fact, some discovery responses provided by Karim and Sheida themselves in the civil suit were marked "HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS'

# III.
# MEMORANDUM OF POINTS AND AUTHORITIES

### A.    Legal Standard.

The Court has explicit power to issue protective orders regulating discovery. Fed. R. Crim. P. 16(d)(1).  Specifically, "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."  *Id.*; *see also Alderman v. United States*, 394 U.S. 165, 185 (1969) ("The trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials").  The Court has "ample power" to issue protective orders, and its discretion in this regard is "vast."  Wright & Miller, 2 Fed. Prac. & Proc. Crim. § 262 (4th ed. Apr. 2022 update).

Courts routinely issue protective orders for a host of reasons, including to shield ongoing law enforcement investigations,[4] and to protect the rights of uncharged third

---

EYES ONLY," apparently reflecting Karim and Sheida's judgment that the information was highly sensitive and confidential and should not be publicly disseminated or shown to anyone besides counsel.

[4]   *See, e.g.*, *United States v. McCaughey*, 534 F. Supp. 3d 132, 139 (D.D.C. 2021) (granting protective order given "ongoing criminal investigation into the events of January 6"); *United States v. Concord Mgmt. & Consulting LLC*, 404 F. Supp. 3d 67, 75 (D.D.C. 2019) (observing that protective order was appropriate when disclosure could "compromise an ongoing investigation"); *United States v. Smith*, 985 F. Supp. 2d 506, 531 (S.D.N.Y. 2013) ("[W]here public disclosure of certain materials might officially reveal the sources and methods law enforcement officials have used, and will continue to use, to investigate other criminal conduct related to the publicly filed charges, courts have found it appropriate to enter a protective order.").

parties,[5] including their economic interests.[6]  Courts are particularly mindful of public disclosure of allegations of wrongdoing against uncharged third parties, since those third parties would not have the opportunity to vindicate themselves at trial.[7]

The standard for entering a protective order is simply "good cause." Fed. R. Crim. P. 16(d)(1).  The specificity of the showing required to establish good cause may vary with the scope and complexity of the case.  In "cases of unusual scope and complexity . . . broad protection during the pretrial stages of litigation may be warranted without a highly particularized finding of good cause." *In re Terrorist Attacks on Sept. 11, 2011*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (finding good cause where

---

[5] *See, e.g.*, *Concord Mgmt. & Consulting LLC*, 404 F. Supp. 3d at 75 (observing that protective order was appropriate when public disclosure could "infringe on the privacy of uncharged third parties and others associated with a case"); *United States v. Johnson*, 191 F. Supp. 3d 363, 371 (M.D. Pa. 2016) (ruling that privacy interest of more than 50 uncharged third parties was good cause to enter protective order); *Smith*, 985 F. Supp. 2d at 524 ("[C]ourts have recognized that the interests of third parties may justify restrictions on public access to judicial and other documents and materials."); *United States v. Dimasi*, Cr. No. 09-10166-MLW, 2011 WL 915349, at *4 (D. Mass. Mar. 16, 2011) (unpub.) (ruling that protective order was justified, among other things, "to protect the privacy interests of third parties").

[6] *See, e.g.*, *United States v. Carriles*, 654 F. Supp. 2d 557, 567 (W.D. Tex. 2009) ("It is well settled that preventing harm to a person's economic interests is an appropriate purpose of a protective order.").

[7] *See, e.g.*, *Certain Interested Individuals, John Does I-V, Who Are Emps. of McDonnell Douglas Corp. v. Pulitzer Pub. Co.*, 895 F.2d 460, 467 (8th Cir. 1990) (preventing disclosure of search warrant affidavits that implicated unindicted third parties in criminal conduct, as "[d]isclosure could seriously damage their reputations and careers" and those parties "have no judicial forum in which they may potentially vindicate themselves or their conduct"); *United States v. Smith*, 776 F.2d 1104, 1113–14 (3d Cir. 1985) (disallowing public disclosure of identities of unindicted co-conspirators, given "irreparable" and potentially "career ending" injuries to their reputations, without "an opportunity to prove their innocence at trial"); *In re Smith*, 656 F.2d 1101, 1106–07 (5th Cir. 1981) (striking public reference to unindicted third party who allegedly received bribes, as he suffered harm to his reputation and economic interests with no "forum in which to vindicate his rights").

discovery would encompass an "enormous" number of documents containing "sensitive or confidential information" despite recognizing that, "[u]nder normal circumstances, such broad assertions of good cause would be too generalized to support imposition of a protective order"). This loosened standard is appropriate because requiring a particularized showing in highly complex cases "could impose an enormous burden upon the Court and severely hinder its progress toward resolution of pretrial matters." *Id*. at 223.

A protective order may also be warranted where one party is a fugitive, based on the principles underlying the fugitive disentitlement doctrine. "The doctrine of fugitive disentitlement is one of long standing." *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1054 (9th Cir. 1991) (citing cases). The U.S. Supreme Court has approved the fugitive disentitlement doctrine as part of the inherent authority of courts to "protect their proceedings and judgments." *Degen v. United States*, 517 U.S. 820, 823-24 (1996). It provides, as an equitable matter, that a court may refuse to entertain claims in litigation by parties that have refused to submit to the court's jurisdiction by remaining fugitives. The doctrine is justified by the difficulties of enforcing court orders against a fugitive; the inequity of allowing a fugitive to avail herself of the court's resources while refusing to submit to jurisdiction; the "heads I win, tails you lose" unfairness of permitting a fugitive to profit from a favorable decision, but avoid the consequences of an unfavorable one; and the need to avoid prejudice to the non-fugitive party. *Cf. United States v. Nabepanha*, 200 F.R.D. 480, 483 (S.D. Fla. 2001) (citations omitted). Courts have relied on the fugitive disentitlement doctrine to defer ruling on motions filed by defendants who have not yet been arraigned in pending criminal actions.[8]

---

[8] *See, e.g., United States v. Besarovic,* Cr. No. 2:12-cr-0004-APG-GWF, 2017 WL 6762479, at *1 (D. Nevada Oct. 5, 2017) (unpublished) (relying on the fugitive disentitlement doctrine to deny Defendant's motion to dismiss); *United States v. Chung Chen Yeh*, Cr. No. 10-00231-WHA, 2013 WL 2146572, at *3 (N.D. Cal. May 15, 2013) (unpublished) (same); *United States v. Oliveri*, 190 F. Supp. 2d 933, 936 (S.D. Tex.

Courts have extended the principles of fugitive disentitlement to the discovery context where a fugitive party seeks to obtain access to discovery. *I.e.*, *Nabepanha*, 200 F.R.D. at 483; *see also In re Extradition of Zhenly Ye Gon*, 613 F. Supp. 2d 92, 102 (D.D.C. 2009) ("Additionally, it cannot be suggested that an American defendant is entitled to discovery before a preliminary hearing or before the presentation of evidence against him to a grand jury. Yet, if a defendant whose extradition [from the United States] is sought gets such discovery, he would be accorded a right that is not available to him under American law.").

**B.     Analysis.**

    **1.     The Court should enter a protective order.**

In this case, based on their negotiations, the parties (excluding Sheida) have agreed that the provisions in the protective order are warranted besides the provisions prohibiting the arraigned defendants from disclosing discovery materials to Sheida prior to her appearance before this Court, *see* Proposed Order ¶ 5, and the marking of any discovery as "Attorney's Eyes Only," *see id.* ¶ 6. Specifically, the attached Proposed Order is substantively the same as the version shared with defense counsel, apart from a handful of modifications intended to clarify its terms.

In fact, the agreed-upon terms of the protective order are amply justified by good cause. The discovery includes a blizzard of sensitive personal and financial information, including about uncharged third parties (both individuals and corporate entities) as well as about the defendants themselves, which will also be disclosed to each of the other arraigned defendants. These records include PII, social security numbers, bank records including account numbers and wire details, residential

---

2001) (same); *United States v. Eagleson*, 874 F. Supp. 27, 29-31 (D. Mass. 1994) (denying without prejudice Defendant's motion to vacate *ex parte* restraining order and *lis pendens* based on fugitive disentitlement); *United States v. Stanzione*, 391 F. Supp. 1201, 1202 (S.D.N.Y. 1975) (relying on the fugitive disentitlement doctrine to deny Defendant's motion to dismiss); *United States v. Grajales-Lemos*, No. CR 94-621, 2012 WL 1405712, at *1-2 (S.D. Fla. Mar. 27, 2012).

addresses and telephone numbers, and tens of thousands of emails. The Privacy Act of 1974 requires the Department of Justice to safeguard much of this sensitive information and provides for civil penalties where disclosure adversely affects an individual. 5 U.S.C. § 552a(g).

Without suitable protections, the release of this material could threaten significant adverse reputational or economic consequences to individuals and businesses not currently charged but which were related to the charged fraud scheme. Without adequate safeguards, and particularly in the hands of a defendant who is not yet subject to this Court's orders, the discovery could be easily photographed, replicated, and posted to the internet or otherwise publicly disseminated.

Unrestricted disclosure could also compromise the government's ongoing investigation by highlighting other potential targets or avenues of investigation, which could itself encourage uncharged individuals to alter or destroy evidence, or to secrete or transfer forfeitable assets.

Alternatively, requiring the United States to stamp individual documents or pages, release documents only to individual defendants, or redact the discovery before production, would be extraordinarily burdensome where the first round of discovery alone is over a quarter of a million pages. Basic protections requiring the discovery to be treated as confidential and used only for the defense of this case will protect uncharged third parties, safeguard sensitive personal and financial information (including PII) for the defendants and third parties, and prevent unauthorized and needless disclosure of sensitive business materials.

Taking these facts together, there is sufficient good cause to enter the protective order generally.

**2.    The protective order should bar disclosure of discovery to Sheida.**

There is also good cause to fashion an order that prevents disclosure of any discovery to Sheida or her counsel prior to her arraignment in this case. Specifically, the Court's protective order should prohibit such disclosure, primarily because Sheida

is outside of the Court's jurisdiction and has a powerful incentive to use access to the discovery in a manner inconsistent with the proposed protective order. Furthermore, since Sheida has not submitted herself to the jurisdiction of this Court, the Court would lack any ability to enforce its protective order against her, should there be any violation.

At the threshold, formal extradition proceedings against Sheida have commenced, and it is presently unknown whether Sheida will elect to waive extradition and submit to the Court's jurisdiction on the pending charges. Should she choose to do so, this issue will doubtless become moot, as the United States would anticipate entering a protective order with Sheida similar to the uncontested portions of the order requested in this motion, and she would thereupon have her own access to the discovery, under the Court's supervision and per the terms of an enforceable protective order.

Should Sheida elect to contest extradition, however, she would continue to be a fugitive from this Court's jurisdiction, and would consequently not be entitled to discovery. In the context of tolling of the statute of limitations for fugitives, the Ninth Circuit has squarely ruled that a defendant's "knowledge . . . that he was wanted by the police, coupled with his failure to submit to arrest, is enough to establish the requisite specific intent to avoid arrest or prosecution" for fugitive status. *United States v. Wazney*, 529 F.2d 1287, 1289 (9th Cir. 1976). The Ninth Circuit has also ruled that a person remaining abroad knowing that they are subject to arrest in a particular jurisdiction makes the person a fugitive for purposes of the fugitive disentitlement provision of the civil forfeiture laws. *See United States v. $671,160.00 in U.S. Currency*, 730 F.3d 1051, 1056 (9th Cir. 2013) (for purposes of 28 U.S.C. § 2466, "a claimant may still be a fugitive if, while legally outside the jurisdiction, he decides not to return to the United States to face a pending criminal charge").

So too here. Because Sheida is plainly aware that she is subject to a warrant in this jurisdiction, and has not submitted to this Court's jurisdiction, she is a fugitive from these proceedings. *See, e.g.*, *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984) (rejecting argument that "a non-fugitive cannot become a fugitive by virtue of his

resistance to extradition" and holding that "intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities once he learns that charges against him are pending"); *see also Schuster v. United States*, 765 F.2d 1047, 1050 (11th Cir. 1985) (defendant "established her status as a fugitive from this nation's criminal process, particularly as of the moment she chose to resist extradition").

As a fugitive, Sheida cannot have access to discovery in this case. Such access would permit her to avail herself of many of the beneficial aspects of participating in this suit, while avoiding the potential negative consequences of actually submitting to the Court's jurisdiction. It would allow Sheida an opportunity to use the discovery in this case to attack the forthcoming extradition proceedings against her in Canada, which would be a direct violation of the protective order. And in either case, the Court would be unable to enforce any limitations on Sheida's further use of the discovery under the protective order, because of her status as a fugitive outside the Court's authority.

Finally, disclosure to Sheida—outside of the enforceable terms of any protective order—would present serious risks to the government's ongoing investigation. For example, it could allow Sheida to identify and attempt to influence potential witnesses against her, including witnesses located in Canada.[9] It could provide Sheida with a roadmap to transferring or secreting potentially forfeitable assets ahead of the United States' ability to identify and restrain them. Or it could allow Sheida to further disseminate discovery to uncharged potential targets, who could take any of these steps themselves. Crucially, in none of these cases would the United States—or the Court— have any recourse against Sheida while she remains a fugitive from these proceedings. This would seriously undermine each of the purposes of entering the protective order in the first place.

---

[9]   On this score, each of the arraigned defendants is presently subject to a condition of pretrial release forbidding them from speaking with each other or with potential witnesses except in the presence of counsel, on pain of revocation of bail. *See* ECF 20, 39, and 51. Sheida is subject to no such condition.

The fact that Sheida is a fugitive charged with conspiring with the arraigned defendants does not change the good cause analysis. This Court routinely enters protective orders to restrict discovery in conspiracy cases where one or more members of the conspiracy are fugitives. *See, e.g.*, *United States v. Villarreal et al.*, 19-CR-2853-BAS, ECF Nos. 27, 36, 43, 58, 62, 67 (S.D. Cal. 2019) (protective orders entered in conspiracy to distribute controlled substances case despite co-defendant Carlos Enrique Saucedo being a fugitive for nearly two years); *United States v. Herrera-Pardo et al.*, 19-CR-1274-BAS, ECF No. 152 (protective order entered in multi-count controlled substances conspiracy despite at least five co-defendant fugitives); *United States v. Ayub et al*, 21-CR-1623-JLS, ECF No. 36 (S.D. Cal. 2021) (protective order entered in RICO conspiracy case despite 16 co-defendant fugitives). Nothing about the nature of a conspiracy charge coupled with fugitive co-defendants changes the good cause calculation as to the limitations for presently appearing defendants.

**3.      There is no immediate prejudice from entering the requested order.**

Entering a protective order that permits open disclosure of the discovery to Sheida and her counsel is generally unwarranted, but it is particularly unwise now. First, as noted, Sheida may elect to waive extradition and be arraigned in these proceedings. In that case, this dispute would be moot.

Second, the defense may naturally seek modification of the Court's order at any time. For example, upon receiving discovery, if the defense determines that Sheida is willing to be interviewed and preparing the parties' defense requires showing a subset of the materials to Sheida, it could seek to modify the protective order for those materials at that time, and the Court could then address a ripe dispute in concrete terms. On the other hand, if no protective order is entered blocking fugitive access to the discovery, materials once disclosed to someone outside the jurisdiction of the Court are potentially leaked forever. There would be no legal mechanism to claw them back. Put another way, the only irreparable harm raised by the issues in the protective order at this point is the harm of *insufficiently* securing discovery and permitting it to be

disclosed outside the United States to someone with a strong incentive to misuse it. Entering an order prohibiting that disclosure is not only prudent; it would also be subject to further fine-tuning and modification if it proved to be an unworkable burden on the defense once discovery is actually disclosed to the defendants appearing in this case.

**4.  Temporary attorney's-eyes-only designations are warranted.**

As noted above, Qualcomm is presently reviewing approximately 700 documents that it produced in the prior civil lawsuit with an attorney's-eyes-only designation to determine whether those documents should receive similar heightened protection in this action. The proposed protective order contemplates such a designation for this class of documents, which consist primarily of sensitive technical information about Qualcomm technologies. But the proposed protective order offers two express and important caveats. First, the proposed protective order requires the United States to revisit the designations sixty days after entry of the protective order—a time period that should be sufficient for Qualcomm to complete its review of the documents. Second, the proposed protective order makes clear that the defendants have the right to contest the designation of any document as attorney's eyes only.

The United States believes these express caveats strike an appropriate balance between limiting the dissemination of sensitive documents and defendants' desire to review those documents with their retained counsel. In particular, a limited period of heightened protection is justified by the claims in this case, which allege that Karim conveyed sensitive inside information about Qualcomm to outsiders as part of an effort to defraud the company of $150 million. While Karim no longer works at Qualcomm, he still works in the tech industry, and there are obviously strong reasons for the victim of his fraud to be concerned about disclosing very sensitive technical information to someone working outside the company in an identical field.

## IV.
## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court enter a protective order governing criminal discovery. A proposed order is attached hereto, and an electronic copy will be submitted separately to chambers.

DATED: September 23, 2022

RANDY S. GROSSMAN
United States Attorney

/s/ Nicholas W. Pilchak
NICHOLAS W. PILCHAK
MEGHAN E. HEESCH
ERIC R. OLAH
Assistant U.S. Attorneys