DAVID K. WILLINGHAM (Bar No. 198874)
*dwillingham@kslaw.com*
JAMIE A. LANG (Bar No. 253769)
*jlang@kslaw.com*
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone (213) 218-4005
Facsimile: (213) 443-4310

Attorneys for Defendant
ALI AKBAR SHOKOUHI

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KARIM ARABI, et al.,<br><br>Defendant. | Case No. 3:22-cr-01152-BAS-4<br><br>**DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF**<br><br>Date: February 6, 2026<br>Time: 9:30 a.m.<br>Crtrm.: 12B<br>The Honorable Cynthia A. Bashant |

**[PUBLIC – REDACTS MATERIALS FROM CONDITIONALLY SEALED RECORD]**

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION ................................................................................................. 1

II.  THE GUIDELINES STATE THAT A NON-CUSTODIAL SENTENCE IS
     APPROPRIATE ................................................................................................. 4

III. THE SENTENCING FACTORS JUSTIFY A NON-CUSTODIAL
     SENTENCE ......................................................................................................... 5

     A.   Mr. Shokouhi's History and Characteristics Support a Non-Custodial
          Sentence ...................................................................................................... 6

          1.   Mr. Shokouhi Overcame Many Hardships During Adolescence,
               Including Escaping the Iranian Revolution .................................... 6

          2.   Mr. Shokouhi Is a Devoted Father and Husband, and Friend to
               Many .............................................................................................. 10

          3.   Mr. Shokouhi Has Helped Those Struggling with Personal
               Challenges ..................................................................................... 12

          4.   Mr. Shokouhi Cares for and Gives Generously to Friends,
               Colleagues, and Community Members ......................................... 14

     B.   The Nature and Circumstances of the Offense ........................................ 16

     C.   Mr. Shokouhi's Acceptance of Responsibility and Cooperation.............. 17

     D.   The Need to Avoid Unwarranted Sentencing Disparities Supports a
          Non-Custodial Sentence ........................................................................... 18

     E.   Incarceration Would Be Disproportionately Punitive on Mr. Shokouhi
          Who Is Unlikely to Survive in Prison Due to His Complex Health
          Conditions ................................................................................................. 20

     F.   The Requested Sentence Achieves Adequate Deterrence ........................ 28

     G.   The Recommended Restitution of $16,084,946, Paid at No More than
          $500 a Month, is Appropriate .................................................................. 30

IV.  A FINE SHOULD NOT BE IMPOSED, CONSISTENT WITH THE TERMS
     OF THE PARTIES' PLEA AGREEMENT............................................................ 33

V.   CONCLUSION.................................................................................................. 33

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Dean v. United States*,
   137 S. Ct. 1170 (2017)................................................................................6

*Gall v. United States*,
   552 U.S. 38 (2007).....................................................................................5

*Miller v. Alabama*,
   567 U.S. 460 (2012)..................................................................................6

*Pepper v. United States*,
   562 U.S. 476 (2011)..................................................................................6

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ....................................................29

*United States v. Booker*,
   543 U.S. 220 (2005)..................................................................................5

*United States v. Cooper Lee*,
   19-Cr-00376-RS (N.D. Cal.) ..................................................................20

*United States v. Edwards*,
   595 F.3d 1004 (9th Cir. 2010) ................................................................27

*United States v. Givens*,
   No. 04-CR-478, 2006 WL 3390752 (D. Neb. Nov. 22, 2006)............................3

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ....................................................28

*United States v. Harris*,
   679 F.3d 1179 (9th Cir. 2012) ..................................................................5

*United States v. Hernandez*,
   No. 03 Cr. 1257 (RWS), 2005 WL 1242344 (S.D.N.Y. May 24, 2005)...........28

*United States v. Hoffmann*,
   2006 WL 3390736, at *6 (D. Neb. Nov. 22, 2006), *aff'd*, 556 F.3d 871
   (8th Cir. 2009) ........................................................................................29

*United States v. Jeremy Carter,*
   03-Cr-1089-SVW (C.D. Cal.)..............................................................19

*United States v. Losovsky,*
   571 F. Supp. 2d 545 (S.D.N.Y. 2008) ..............................................17

*United States v. Ministro-Tapia,*
   470 F.3d 137 (2d Cir. 2006) ...............................................................6

*United States v. Pinkey McFarlin,*
   535 F.3d 808 (8th Cir. 2008) ............................................................27

*United States v. Richard Boomgaardt,*
   17-Cr-10167-DJC, ECF No. 37 (D. Mass. Aug. 3, 2018)...........19, 29

*United States v. Wadena,*
   470 F.3d 735 (8th Cir. 2006) ............................................................29

*United States v. Warner,*
   792 F.3d 847 (7th Cir. 2015) ............................................................16

*United States v. Wayne Kreisberg,*
   16-Cr-00353-JSM-JSS (M.D. Fla.) ..................................................19

*United States v. White,*
   506 F.3d 635 (8th Cir. 2007) ............................................................20

*Williams v. New York,*
   337 U.S. 241 (1949)............................................................................6

**Statutes**

18 U.S.C. §1957.................................................................................1, 4

18 U.S.C. § 3553......................................................................*passim*

28 U.S.C. § 994(d) ...............................................................................2

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

## I.     INTRODUCTION

Ali Akbar Shokouhi comes before this Court for sentencing on one count of money laundering in violation of 18 U.S.C. §1957. He accepted full responsibility for his conduct and has substantially cooperated with the government's investigation and prosecution of this case, including testifying at the trial of one of his co-defendants. At 66 years old, this is his first criminal conviction. He has otherwise led a positive and productive life characterized by tremendous hard work, generosity and resilience. Beyond providing and caring for his family, Mr. Shokouhi, a refugee from Iran, has always found time to help those around him. From financially and emotionally supporting those facing personal challenges to giving his time and money to charitable and religious institutions, Mr. Shokouhi has never stopped looking for ways to give back to the country that welcomed him during one of the most difficult and challenging times in his life.

Mr. Shokouhi's acceptance of responsibility and cooperation with the government's investigation, his longstanding history of positive achievements and contributions to others, his age and serious health conditions, and the punitive consequences that Mr. Shokouhi has already suffered all demonstrate that a non-custodial sentence is sufficient, reasonable, and just.

*First*, as pointed out by Probation, this offense is an "aberration of [Mr. Shokouhi's] law abiding lifestyle." (PSR ¶180.) This sentiment is echoed by the numerous letters of support Mr. Shokouhi has received. Mr. Shokouhi is a self-made man who escaped Revolution-torn Iran and, after overcoming many obstacles, came to the United States with very little to his name. He worked his way up from a cook at a pizza shop to a successful business owner who has employed and supported hundreds of people along the way. Indeed, Mr. Shokouhi has used the many challenges he has faced to fuel his desire to serve his community and help those around him, including students, refugees, the Iranian community, and health causes.

*Second*, the nature and circumstances of this case warrant a downward variance – even before considering Mr. Shokouhi's substantial cooperation with the government's continued investigation and prosecution of this case. While Mr. Shokouhi acknowledges and accepts full responsibility for his role in the scheme, it is important to note that he "was not considered to be an organizer of the scheme, he did not recruit anyone within the scheme, and his profit was significantly less in comparison to [his co-defendants]." (PSR ¶90.) He also had already begun to rectify his mistakes and compensate Qualcomm years before his plea and cooperation through a pre-litigation settlement, as well as voluntarily paid taxes on profits made from the Abreezio sale.

*Third*, a non-custodial sentence is necessary to avoid unwarranted sentencing disparities. As detailed below, non-custodial sentences have routinely been imposed in wire fraud and money laundering cases that involved less substantial cooperation and/or aggravating factors not present here.

*Fourth*, a non-custodial sentence is necessary to allow Mr. Shokouhi to receive the necessary medical treatment for the "several serious, chronic, and interdependent health conditions [he suffers from] which require an ongoing and extensive level of care." (PSR ¶174.) The severity of Mr. Shokouhi's health conditions is reflected in the 10-level downward variance[1] recommended by Probation. (PSR ¶177.) ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[1] Although Probation has recommended a 10-level downward departure based on U.S.S.G. §5H1.4, this Sentencing Brief has framed this recommendation as a variance due to a change in the 2025 Guidelines Manual removing U.S.S.G. §5H1.4. Although the Manual no longer references departures, "[t]he removal of departures . . . does not limit the information courts may consider in imposing a sentence nor does it reflect a view from the Commission that such facts should no longer inform a court for purposes of determining the appropriate sentence." 2025 DOJ Guidelines Manual, pp. 1-2 (November 1, 2025). Additionally, the Sentencing Reform Act of 1984 directs the Commission to consider defendant's age and physical condition. 28 U.S.C. § 994(d).

█████████████████████████████████████████████████ Given Mr.

Shokouhi's age and medical conditions, a custodial sentence will be far more punitive

for him than the average defendant and exceeds what is sufficient to achieve just

punishment and adequate deterrence. 18 U.S.C. § 3553(a)(2).

*Finally*, a non-custodial sentence is sufficient to reflect the seriousness of the

offense, promote respect for the law, provide for just punishment, afford adequate

deterrence, and ensure protection of the public. This case has already had devastating

consequences for Mr. Shokouhi. In addition to the psychological toll that his

indictment, plea and cooperation have had on him and his family, Mr. Shokouhi has

suffered substantial financial loss and reputational harm. His businesses are no longer

profitable, he has all but depleted the trust account he set up for his daughters to help

pay his living and medical expenses, and he has agreed to sell his primary residence –

which accounts for the majority of his assets – to help satisfy his forfeiture and

restitutions obligations. Courts recognize that such serious consequences already have

enormous deterrent and punitive value, rendering custody unnecessary. *See, e.g.*,

*United States v. Givens*, No. 04-CR-478, 2006 WL 3390752, at *5–6 (D. Neb. Nov. 22,

2006) (finding a sentence of home confinement appropriate partly in light of

defendant's "los[s] [of] his home and business as a result of his conduct" as well as the

"embarrassment, loss of reputation, and stigma" that defendant suffered due to the

conviction).

In addition to the § 3553(a) factors which, as outlined above, warrant a

substantial downward variance, Mr. Shokouhi also objects to the guidelines calculation

in the PSR and respectfully submits that the correct total offense level is 22, as agreed

upon by the parties in his plea agreement, which results in an applicable guidelines

range of 41-51 months given Mr. Shokouhi's Criminal History Category I. (*See* Plea

Agmt. (ECF No. 179 at p. 9).)

1    For all of these reasons and as set forth more fully below, Mr. Shokouhi

2   respectfully submits that a sentence of time served and one year of supervised release is

3   sufficient but not greater than necessary to effectuate the goals of sentencing.

4   **II.    THE GUIDELINES STATE THAT A NON-CUSTODIAL SENTENCE**

5   **IS APPROPRIATE**

6    Mr. Shokouhi respectfully objects to the $180 million loss calculation and the

7   corresponding 26-level enhancement reflected in the PSR because it is based on the

8   total amount Qualcomm paid for Abreezio rather than Mr. Shokouhi's individual

9   proceeds from the sale. Mr. Shokouhi submits that the appropriate loss amount should

10  be $16,084,946, resulting in a 20-level enhancement, which is the loss amount agreed

11  to by the parties in the plea agreement. (ECF No. 179 at p. 9.) This amount represents

12  Mr. Shokouhi's individual profit from the offense, minus the amount he paid back to

13  Qualcomm in 2020 (prior to the indictment in this case), and is also reflective of Mr.

14  Shokouhi's role in the offense as compared to his co-defendants, as described in the

15  indictment and the PSR.[2] Mr. Shokouhi therefore submits that the following guidelines

16  calculation, as detailed in the plea agreement, is appropriate:

17  | | | |
    |---|---|---|
    | Base Offense Level: | 6 | U.S.S.G. §§ 2S1.1(a)(1)/ |
    | | | 2B1.1(a)(2) |
    | Loss > $9.5 million: | +20 | U.S.S.G. § 2B1.1(b)(1)(K) |
    | Violation of § 1957: | +1 | U.S.S.G. § 2S1.1(b)(2)(A) |
    | Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1(a)/(b) |
    | Zero-Offender Criminal History: | -2 | U.S.S.G. §4C1.1 |
    | Total Offense Level: | 22 | |

---

[2] *See, e.g.*, PSR ¶¶ 47, 90.

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

Using a total offense level of 22 and a Criminal History Category I (Mr. Shokouhi has no criminal history), the applicable sentencing guidelines range is 41-51 months before any additional sentencing factors are taken into account.

We agree with the PSR's assessment that the mitigating circumstances in this case, including Mr. Shokouhi's life history, longstanding charitable and other good works, as well as his age and numerous health complications warrant at least a 10-level downward variance.[3] (*See* PSR ¶¶177, 185.) While we believe that a further variance may be warranted based upon these significant issues, the Court need not make that assessment. Because Mr. Shokouhi's substantial cooperation warrants a further reduction of his sentence, an application of the aforementioned variance under Section 3553(a) plus a cooperation reduction compels the conclusion that Mr. Shokouhi should be sentenced to time served and one year of supervised release.[4]

## III.    THE SENTENCING FACTORS JUSTIFY A NON-CUSTODIAL SENTENCE

"Sentencing is an art, not to be performed as a mechanical process but as a sensitive response to a particular person who has a particular personal history and has committed a particular crime." *United States v. Harris*, 679 F.3d 1179, 1183 (9th Cir. 2012). Thus, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007) (citation omitted); *see also United States*

---

[3] Notably, Probation believes an additional downward variance – beyond the 10-level variance on account of Mr. Shokouhi's serious health conditions – is warranted based on the Section 3553(a) factors. As a result, even using the disputed higher loss amount (which results in a higher guidelines range to start, of 78-97 months) and even *before* any consideration of Mr. Shokouhi's substantial cooperation, Probation submits that a sentence of 12 months and a day is sufficient, but not greater than necessary to effectuate the goals of sentencing. (PSR ¶¶185-186.)

[4] As reflected in Mr. Shokouhi's Sentencing Summary Chart filed concurrently, after accounting for a 10-level downward variance for his serious health conditions under Section 3553(a)(2) and a 6-level downward departure under U.S.S.G., Section 5K1.1 for the substantial assistance Mr. Shokouhi provided, the total offense level is 6, resulting in a guidelines range of 0-6 months. *See* Mr. Shokouhi's Sentencing Summary Chart filed concurrently.

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

*v. Booker*, 543 U.S. 220, 264 (2005). Instead, the Supreme Court requires individualized sentencing, affirming "the principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *see also Miller v. Alabama*, 567 U.S. 460, 469 (2012) ("[P]unishment for crime should be graduated and proportioned to both the offender and the offense." (citation and internal quotation marks omitted)). "[A] sentencing judge's overarching duty under § 3553(a) [is] to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes [ ] in § 3553(a)(2)," *Pepper*, 562 U.S. at 491, which are "just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017). If the Court determines that sentences of varying lengths could "equally serve the statutory purpose of § 3553," the Court must, "consistent with the parsimony clause," impose the lowest possible sentence. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

Here, a sentence of time served and one year of supervised release reflects the seriousness of the offense, provides respect for the law, represents a just punishment, and provides adequate deterrence and protection of the public. *See* 18 U.S.C. § 3553.

## A.    Mr. Shokouhi's History and Characteristics Support a Non-Custodial Sentence

In assessing a reasonable sentence, the Court must consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a). Mr. Shokouhi's life has been filled with hard work and compassion for others, demonstrating that the offense is an out-of-character aberration and a non-custodial sentence is more than sufficient to achieve a just result in this case.

### 1.    Mr. Shokouhi Overcame Many Hardships During Adolescence, Including Escaping the Iranian Revolution

Mr. Shokouhi was born in Shiraz, Iran in 1959. (PSR ¶103.) His family belonged to the nomadic Kuchi tribe. (*Id.*) His father, Ali Naghi, was a respected member of the

tribe and a farm owner. (*Id.*) Mr. Shokouhi was brought up alongside four brothers and three sisters. Although Mr. Shokouhi generally had a happy childhood and was close with his family, his upbringing was modest. (PSR ¶105.) His childhood home had "one bedroom [that was shared by] six people, a bathroom outside[,] and a kitchen that was nothing but a wide window with a water tap." (Exh. A-1 at p. 3; PSR ¶105.)

Mr. Shokouhi was very close with his father who often took young Mr. Shokouhi along with him to meetings with state officials on behalf of the tribe. Tragically, Mr. Shokouhi's father died in a car accident when Mr. Shokouhi was nine years old. (PSR ¶103.) After Mr. Shokouhi's father passed away, his mother, Fatemeh, took over the farming business and Mr. Shokouhi and his siblings all helped their mother support their family. (PSR ¶104.) Mr. Shokouhi's mother left a profound impact on his life: whenever life gets hard, he remembers what his mother had to go through in caring and providing for eight children by herself. (*Id.*)

Mr. Shokouhi graduated high school in July 1978 in the midst of the Iranian Revolution when the revolutionaries repurposed many of the country's academic institutions and revised the curricula causing thousands of university professors to flee the country and the universities to close. (PSR ¶105.) Faced with the realities of the new regime, Mr. Shokouhi found a way to move on his own to Hyderabad, Telangana, India and began studying at Osmania University. (*Id.*)

Like Mr. Shokouhi's father, Mr. Shokouhi is drawn to supporting the members of his community. This quality led him to meet his wife, Fariba. Fariba remembers, "[H]e had a reputation for helping new students coming from Iran as refugees or students who escaped the Islamic Republic of Iran. . . [He] took the newcomers under his wing and made living in a new country a little easier for them. My brother was one of them, and that is how we met." (Exh. A at p. 1.) Describing their life as refugees in India, Fariba writes, "[B]eing 18 years old, everything was so strange and different in India. We weren't tourists enjoying a beautiful country before going back home.

'Home' in Iran didn't welcome us anymore, and for the next five years, India was our home." (*Id.*)

Unfortunately, in 1981, towards the end of his second year in college, Mr. Shokouhi got very sick. (PSR ¶116.) ████████████████████ ████████████████████████ (*Id.*) Mr. Shokouhi went back to Iran to get a second opinion and receive treatment. (Exh. A at p. 1.) Four days before he was scheduled to fly back to India, Mr. Shokouhi received a telegram message from a friend informing him that a student from Osmania University who, like Mr. Shokouhi, openly opposed dictatorship in Iran, had been executed at the Tehran airport by the revolutionary leadership.[5] In Mr. Shokouhi's case, the Iranian government had previously approached his mother to inform her of her son's anti-regime views, and had even shown her a photo of Mr. Shokouhi participating in a demonstration in India against the President of Iran. With Mr. Shokouhi's name on the government's radar, he knew he had to find another way back to India. (Exh. A at p. 1.)

Twenty-one years old at the time and still recovering from a condition that doctors thought would take his life, Mr. Shokouhi crafted a plan to escape persecution in his own home country. He took a plane to the south of Iran, where he met with a family friend who helped him get to the border of Iran and Pakistan. Although Mr. Shokouhi was given instructions by this friend on how to cross the border, he was alone in crossing—and he knew that if he took a wrong step, he would be caught by the border police who would quickly turn him over to the Revolutionary Guards. (*Id.*) Mr.

---

[5] This unfortunately was not uncommon at that point in history. "In June 1981, the Islamic Republic of Iran went about arresting, imprisoning, torturing and executing thousands upon thousands of Iranian citizens because their beliefs and political engagements conflicted with that of the regime." *See* Iran Tribunal, *History of Mass Executions in 1980s*, https://irantribunal.com/mass-executions/history-of-mass-executions-in-1980s/; *see also* Wikipedia, *Casualties of the Iranian Revolution*, https://en.wikipedia.org/wiki/Casualties_of_the_Iranian_Revolution ("According to estimations by the military historian Spencer C. Tucker, in the period of 1980 to 1985, between 25,000 to 40,000 Iranians were arrested, 15,000 Iranians were tried and 8,000 to 9,500 Iranians were executed.").

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

Shokouhi risked his life by crossing the border into Pakistan, driving 16 hours to Quetta, flying to Islamabad and then on to Mumbai (Bombay at the time), and then driving the rest of the way to Hyderabad.[6] This was the last time Mr. Shokouhi saw Iran, his home, and his family for 23 years. To this day, Mr. Shokouhi is himself amazed that he was able to escape.

Although Mr. Shokouhi was able to escape persecution in Iran, he was still punished for opposing the Iranian government, as the regime prohibited Mr. Shokouhi's family from sending him any more money. At that time, there was a job shortage in India, so Mr. Shokouhi's only source of income had been the money his family sent. For a year and a half, Mr. Shokouhi lived on 500 Rupees per month (equivalent to $6) that he received from the United Nations, which was barely enough to cover his school expenses. (PSR ¶131.) He recalls having to cut down on food, sometimes eating an egg a day, and sharing a one-bedroom home with four other students who were in a similar situation. (*Id.*) At the same time, Mr. Shokouhi's health was getting worse. ███████████████████████████████████ ████████████████████████████████████████████████ ████████████ Against all odds, Mr. Shokouhi remained dedicated to his academics and successfully graduated from Osmania University in 1984 with a degree in Physics. (*Id.*)

Mr. Shokouhi pushed through his hardships, driven by a desire to move to the United States. In 1985, he was granted refugee status. (PSR ¶180.) On July 9, 1985, he started his journey to San Diego, California where Fariba had moved after receiving her green card. (Exh. A at p. 2.) He remembers having his wallet stolen at the airport in India and arriving in California "with nothing in his pocket." (*Id.*) Upon arrival, Mr. Shokouhi quickly got a job as a cook at a pizza shop making $3.50 an hour. (PSR ¶150.) He took two different buses to get to work and worked 18-hour shifts. In 1986,

---

[6] While the PSR states that Mr. Shokouhi made this escape upon graduating high school, (*see* PSR ¶105), as described above, he did so while he was a student at Osmania University in India.

he began working at Spin Physics soldering wires on airplane parts, and later joined Unisys Corporation as a technician, making $7 an hour. (PSR ¶149.) To further increase his skillset, Mr. Shokouhi did extra work and stayed at the office later than other technicians but did not charge the company for this overtime work. Mr. Shokouhi's efforts did not go unnoticed, and when his manager also learned that Mr. Shokouhi had a Physics degree from India, Mr. Shokouhi was promoted to a junior engineer position and then later to a senior engineer position. (PSR ¶148.)

From that point on, Mr. Shokouhi excelled in his career. Due to his "remarkable character and unwavering work ethic" (Exh. A at p. 8), Mr. Shokouhi climbed up the ladder and worked in management positions across major semiconductor companies in California, learning about the semiconductor industry along the way. In 1999, Mr. Shokouhi started his own design service business, Quantum Think Group ("QThink"). (PSR ¶145.) Over its 12 years of operation, QThink employed over 500 employees in the United States and over 50 employees in India. When, in 2002, QThink's business was impacted by the recession, and the company had to go through a round of layoffs, Mr. Shokouhi did not take a salary so that he could pay his employees. (Exh. A at p. 12.) Mr. Shokouhi would later go on to found, invest, or provide start-up services for other companies including Encore Semi, Inc. (an engineering services company) and Chronos Tech LLC (a semiconductor technology company).

### 2.    Mr. Shokouhi Is a Devoted Father and Husband, and Friend to Many

Despite achieving immense success in his career, Mr. Shokouhi has always put his family above all else. Mr. Shokouhi and his wife Fariba have been together for 44 years and have been married for 33 years. Fariba describes Mr. Shokouhi as "the pillar" of their family and the "glue" that keeps their family together. (Exh. A at p. 4.)

Mr. Shokouhi is a devoted father to his 31-year-old daughter Sara and 29-year-old daughter Hanna. Hanna describes Mr. Shokouhi as "[her] rock, [her] source of unconditional love, and [her] biggest inspiration." (*Id*. at p. 8.) Sara writes that being

Mr. Shokouhi's daughter is "an honor" and the "bigge[st] blessing." (*Id*. at p. 14.) Mr. Shokouhi is incredibly involved in his daughters' lives, and there was never a moment when they "didn't feel like [Mr. Shokouhi] would drop everything to be 100% there" for them. He "never missed" Hanna's dance performances, "would stay up [with them] late cramming for exams or filling out college applications," (*Id*. at p. 9) and when they were sick in college, he "would stay on the phone [] until [they] fell asleep." (*Id*. at p. 11.) ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ (*Id*. at p. 9.)

Mr. Shokouhi's dependable, caring nature goes beyond his wife and children. When Mr. Shokouhi's niece was ████████████████████, Mr. Shokouhi "provided financial support for her housing, medical needs, and much more." (Exh. A-1 at p. 16.) When Mr. Shokouhi's brother lost his job during the COVID-19 pandemic, Mr. Shokouhi financially supported his brother and his family. (Exh. A at p. 4.)

Mr. Shokouhi has also always equally cared for Fariba's side of the family. When Fariba's father ████████████████████, Mr. Shokouhi made the home wheelchair-friendly and paid for his in-home caregiver. (*Id.*; Exh. A-1. at p. 22.) After Fariba's sister ████████████████ Mr. Shokouhi moved her into his home and made sure she had proper care. (Exh. A-1 at p. 22.) When Fariba's brother died ████████████ in July 2023, Mr. Shokouhi hosted Fariba's relatives for a ceremony in his honor "ma[king] all the arrangements for the ceremony by himself even though[t] he was feeling very ill." (Exh. A at p. 4.)

All of Mr. Shokouhi's and Fariba's nieces and nephews who wrote letters similarly express how Mr. Shokouhi has been actively present in their lives since their birth, supporting them, mentoring them, and helping them in times of need. (Exh. A-1 at pp. 15, 21-22.) Mr. Shokouhi's niece describes him as "her guiding light through every twist and turn" and credits her ability to succeed in the United States and build a

11

successful business to Mr. Shokouhi's encouragement, mentorship, and "selfless emotional and financial support." (*Id.* at p. 15.) Fariba's niece feels the same way about Mr. Shokouhi:

> I owe Akbar absolutely everything, and my life would not be the same if not for his guidance, his love, his intellect, and his boundless generosity. . . [I]t is no exaggeration to say that Akbar is the purest of us all; he gives everything and asks for nothing. There is no member of this large family of ours that shows a kinder, more gentle soul.

(*Id.* at p. 22.)

In addition to the foregoing letters of family members and friends, the other letters submitted herewith are overwhelmingly consistent in emphasizing how Mr. Shokouhi treats everyone around him like they are his family.

### 3.    Mr. Shokouhi Has Helped Those Struggling with Personal Challenges

Those who know Mr. Shokouhi well describe him as "a pillar for his family, his friends, and his community" (Exh. A at p. 10) who "lives for the well-being of those around him" (*id.* at p. 11), "the rock that everyone can lean on" (Exh. A-1 at p. 20), and "a very generous and empathetic person." (*Id.* at p. 23.) As Mr. Shokouhi's brother writes, "[h]e has a heart larger than the oceans and [he] will always seek to enrich the lives of others." (*Id.* at p. 1.) This was true even before Mr. Shokouhi found success. When his friend Salaheddine faced financial challenges starting his new life in the United States in the 1980s, Mr. Shokouhi, who was in the same position and hardly had anything of his own, did not hesitate to help:

> I asked Akbar if I could borrow $2,400 from him for a month or so and pay him back. He said, "I do not have the cash, but I got a new credit card with [a] $2,500 cash limit you can use it."

(*Id.* at p. 3.)

That same friend also describes how, years later, Mr. Shokouhi offered him a job at QThink when his wife was ███████████████████████████████

1

2  ████████████████████████████████ (*Id.* at p. 3.) ██████

3  ████████████████████████████████, this friend

4  relays how Mr. Shokouhi let him take leave from work and also provided him

5  emotional support as he was taking care of his wife and kids. (*Id.* at pp. 3-4.) In the

6  words of Mr. Salaheddine, Mr. Shokouhi's friendship is "like a star in the sky, you

7  might not see [its] light every night, but you know it is always there." (*Id.* at p. 4.)

8          Emblematic of Mr. Shokouhi's belief that family always comes first, he has also

9  helped those who have lost loved ones. When a family friend lost her brother, Mr.

10  Shokouhi supported her during those difficult times:

11              He paused his extremely busy life to ensure that he and his
12              family were there for us. . .  In a moment's notice he dropped
              all business to drive 75 miles north, with no return date in mind.
13              He willingly committed himself to be there in our home for as
              long as my family needed. There were many times he was there
14              to say or do nothing at all, but to sit in silence with us. There
              were times he was there to go grab food or fix something
15              around the home just to show his love – to show his
              unwavering support of my family. His kindness and
16
              compassion gave us the ability to get through unbearable times.
17

18  (*Id.* at p. 5.)

19
20          Similarly, when his friend Mr. Mossallanejad went through the horror of losing

   his son, Mr. Shokouhi was there to help him both emotionally and financially:
21
22              During our stay in Hyderabad, Mr. Shokouhi was unforgettable
              in saving my life and my wife's. He went far beyond his way
23              and mobilized his family members there to extend their
              generous support to us following the loss of our son, Zagros, in
24              a tragic accident on May 21, 1984. . . Without the full and
              consistent support of Fariba, Akbar, and their family members,
25              we would have hardly been able to promote our coping
26              capacity and return to a normal life.

27  (*Id.* at p. 13.)

28

Several Chronos Tech employees, including Stefano Giaconi, have lost their parents. Mr. Shokouhi made sure his employees could grieve and take time off without worrying about their finances:

> Akbar reminded us to take as much time as we needed off (while we were still receiving a full salary) to take care of the loss, because as he always says: "Family is the most important thing in life."

(*Id.* at p. 18.)

In 2017, when a friend's house was damaged by a storm, Mr. Shokouhi immediately offered to help: "He would call and ask how I was doing, and when he learned my homeowner's insurance refused to cover some necessary repairs, he offered to pay for what repairs remained, so I would have a safe place to live." (*Id.* at p. 11.) These actions are just some of the many examples of Mr. Shokouhi's selflessness and unwavering commitment to those in need.

### 4. Mr. Shokouhi Cares for and Gives Generously to Friends, Colleagues, and Community Members

Having forged his own path to success and overcome numerous challenges doing so, Mr. Shokouhi has shared with others the experience and skills he has gained. There is no doubt that Mr. Shokouhi is a mentor to many – whether by serving as a guest speaker to share his experience as an entrepreneur with students taking a course in business management (*see* Exh. C at p. 9.) or mentoring his friends' children. As one friend writes: "I thank Akbar for guiding my own daughter to achieve her dreams. He always took time to help her in her choice for career and was always there to answer her questions." (Exh. A-1 at p. 19.) When Ms. Monaghan, a friend of Mr. Shokouhi's daughter Sara, wanted to start a mental health app, Mr. Shokouhi provided her "business coaching [] which included multiple calls, texts, and conversations" and "valuable tools, skills, resources, and support." (*Id.* at p. 7.) With Mr. Shokouhi's help, Ms. Monaghan was able to succeed during a challenging transition in her career and has come to view Mr. Shokouhi as a "surrogate father." (*Id.*)

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

The same desire to give back has fueled Mr. Shokouhi's charitable and philanthropic efforts focused on education and health – the two things he had to fight for most in his own life. He was a benefactor of the Iranian-American Scholarship Fund that awards scholarships to graduate and undergraduate Iranian students. (PSR ¶154; Exh. C at pp. 1-5.) Mr. Shokouhi also organized, sponsored, and hosted at his home a fundraiser for the Ayeneh Foundation, which focuses on substance abuse and addiction prevention, raising over $60,000 for the foundation in a single day. (*Id.* at p. 6.) When Mr. Shokouhi's daughter Sara approached Mr. Shokouhi about wanting to raise money for a good cause, Mr. Shokouhi helped her organize a fundraiser for the Fred Hutchinson Cancer Research Center, which was held at Qualcomm in the name of a beloved employee in Mr. Shokouhi's department who passed away from breast cancer (*Id.* at pp. 7-8; Exh. A at p. 13.)

Proud of his Iranian background and culture, Mr. Shokouhi has supported the Iranian community and refugees for more than 30 years. When Mr. Shokouhi was a student in India, he worked with Iranian refugees who had just arrived in India helping them settle in, get housing, and apply to colleges. (Exh. A-1 at p. 13) During and after the Iran-Iraq War, Mr. Shokouhi volunteered through a widespread campaign to send "life-saving medications to the war-ravaged areas." (*Id*. at 14.) Further, in around 1984, having gone through the process himself of applying for asylum and working with the United Nations, Mr. Shokouhi began helping Iranian and other refugees in India with immigration paperwork and getting them support from the United Nations. When Mr. Shokouhi moved to the United States, he continued to support refugees and human rights causes, notwithstanding the challenges he himself faced. Mr. Shokouhi "attended almost every demonstration in San Diego, Orange County, and Los Angeles to support freedom for people and equality for women in Iran" (Exh. A at p. 3); he "organized a global fund-raising campaign for the support of the Iranian, Afghan, and Kursidh asylum-seekers" (Exh. A-1 at p. 14); and he "encourage[d] [his wife Fariba] to teach English to refugees." (Exh. A at p. 3.)

1    In short, Mr. Shokouhi's life experience caused him to work hard, never take

2    things for granted, and have an abiding desire to help others. These core beliefs have

3    followed him through every chapter of his life. The facts set forth here show that Mr.

4    Shokouhi is a remarkable man and that his history and characteristics serve as a

5    substantial mitigating factor under 18 U.S.C. § 3553 that warrant a recommendation for

6    a non-custodial sentence. *See, e.g.*, *United States v. Warner,* 792 F.3d 847, 857-59 (7th

7    Cir. 2015) (affirming sentence of 2 years' probation with community service and

8    $100,000 fine for willful tax evasion, where guidelines were 46-57 months, in part

9    because defendant's charitable works and generosity reflected a "genuinely

10    benevolent" character).

## B.    The Nature and Circumstances of the Offense

12    Another statutory factor that must be considered is "the nature and circumstances

13    of the offense." 18 U.S.C. § 3553(a)(1). Here, the nature of the offense supports a non-

14    custodial sentence.

15    Mr. Shokouhi acknowledges and adopts the factual basis of his plea agreement,

16    accepts full responsibility for his conduct and is deeply remorseful for it. However,

17    there are two important factors about Mr. Shokouhi's conduct during and after the

18    offense (separate and apart from his cooperation) that should be considered in

19    determining Mr. Shokouhi's sentence.

20    First, even prior to his plea and cooperation, Mr. Shokouhi had already begun to

21    rectify his mistakes and compensate Qualcomm. In 2020, Mr. Shokouhi was the only

22    defendant to enter into a pre-litigation settlement agreement with Qualcomm, pursuant

23    to which Mr. Shokouhi and his companies returned over $5 million to Qualcomm

24    without forcing Qualcomm to go through the process of filing a lawsuit. (PSR ¶52.) Mr.

25    Shokouhi's commitment to repaying Qualcomm is also evidenced by his agreement in

26    November 2025 to allow for the interlocutory sale of his primary residence, valued at

27    approximately $11,500,000, the proceeds of which will go towards the approximately

28    $16 million he has agreed to pay in forfeiture and restitution. (ECF No. 497). These

16

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

steps that Mr. Shokouhi has taken to compensate Qualcomm reflect his desire to rectify his mistakes and should be considered in determining a proper sentence. As should Mr. Shokouhi's payment (at the time of the sale) of approximately $9.8 million in taxes on profits made from the Abreezio sale, which has not otherwise been credited in calculating his forfeiture and restitution obligations.

Second, Mr. Shokouhi was Defendant No. 4 in an initial four-defendant case and it is clear from the indictment that he was the least culpable charged defendant. Although Mr. Shokouhi acknowledges and accepts responsibility for his role in the scheme, it is important to consider that Mr. Shokouhi was not the CEO or leader of Abreezio, he was also not a board member or final decisionmaker for the company, and he did not develop Abreezio's technology, which is reflected by the money he received from the deal compared to the other co-defendants. (PSR ¶¶47, 90.) Mr. Shokouhi's role in the offense and lesser culpability than others charged should be considered in determining Mr. Shokouhi's sentence. As demonstrated by the whole of his life, and the many of letters of support, and as even noted by Probation, this lapse of judgment was an "aberration of [Mr. Shokouhi's] law abiding lifestyle." (PSR ¶180.)

### C.    Mr. Shokouhi's Acceptance of Responsibility and Cooperation

Mr. Shokouhi's acceptance of responsibility in this case was marked by a guilty plea; proactive and thorough cooperation with the government's investigation and prosecution of the case; full and unqualified admissions of wrongdoing; sincere remorse coupled with concrete steps toward rehabilitation; and an unreserved willingness to accept consequences and make amends. Mr. Shokouhi's acceptance of responsibility and extensive cooperation with the government weigh in favor of a non-custodial sentence. *United States v. Losovsky*, 571 F. Supp. 2d 545, 546 (S.D.N.Y. 2008) (highlighting that cooperators play "a vital role in the Government's law enforcement efforts" and that "the aid cooperators render comes at a heavy personal price.")

Since entering his plea in October 2023, Mr. Shokouhi has cooperated extensively with the government. Indeed, that same month Mr. Shokouhi attended two all-day meetings with the government, during which he provided details about his own conduct and the conduct of others. As part of his cooperation, Mr. Shokouhi also provided emails to the government from his personal email account that the government did not previously have in its possession.

Finally, Mr. Shokouhi also testified at the trial of Mr. Arabi in March 2025, with his testimony occurring over two days. (PSR ¶60.) Prior to doing so, Mr. Shokouhi met with the government on two occasions (in February and March 2025), with each meeting lasting for several hours. Mr. Shokouhi testified notwithstanding the death of his brother, (*see* PSR ¶104), and several health complications that necessitated multiple emergency room visits in the weeks leading up to trial (described in Section III(E) below). As a result of his efforts, we understand the government intends to seek a 6-level downward departure under U.S.S.G., Section 5K1.1 for the substantial assistance Mr. Shokouhi provided.

### D.     The Need to Avoid Unwarranted Sentencing Disparities Supports a Non-Custodial Sentence

"[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), also supports a non-custodial sentence.[7] As demonstrated by the cases below, courts routinely apply significant downward variances to defendants who have accepted responsibility and thoroughly cooperated with the government, ultimately sentencing them to a non-custodial sentence, including in cases with higher guidelines ranges and more egregious underlying conduct than is at issue here:

---

[7] In addition to the cases discussed herein, as previously noted, Mr. Shokouhi's co-defendant Mr. Taneja, who faced the same guidelines as Mr. Shokouhi, received a below-guidelines sentence of time served. Mr. Arabi, the lead defendant who went to trial in this matter, also received a sentence substantially less than what the guidelines called for.

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

- *United States v. Jeremy Carter*, 03-Cr-1089-SVW (C.D. Cal.): Carter pleaded guilty to one count of criminal conspiracy for his role in a Ponzi scheme which victimized nearly 7,000 people in fraudulently collecting more than $250 million. ECF No. 225 at pp. 1-3. Carter's offense level was 38, yielding an applicable guidelines range of 235-293 months (prior to consideration of the statutory maximum sentence available) but he was sentenced to 3 years of probation after waiving extradition and cooperating with the government in a related matter against his co-defendant, including by providing information to Canadian authorities that was used to develop probable cause to execute a search warrant at his co-defendant's home. *Id.* at 1; ECF No. 243.

- *United States v. Wayne Kreisberg*, 16-Cr-00353-JSM-JSS (M.D. Fla.): Kreisberg pleaded guilty to one count of conspiracy to commit health care fraud and one count of conspiracy to engage in racketeering activity for his role in a scheme to defraud private and federal insurance providers out of $121 million by submitting false and fraudulent claims for compounded drugs. ECF No. 273 at p. 1. His offense level was 25 and his Criminal History Category was II, yielding an applicable guidelines range of 63-78 months. ECF No. 604 at p. 4. Per the government's recommendation, which cited his pre-arrest cooperation, provision of documents, and trial testimony against his co-defendant, the court reduced Kreisberg's offense level by 19 and he was sentenced to five years of probation. *Id.*; ECF No. 601 at pp. 2-3.

- *United States v. Richard Boomgaardt*, 17-Cr-10167-DJC (D. Mass.), Boomgaardt pleaded guilty to one count of conspiracy to commit securities fraud and wire fraud for his role in a scheme to defraud clients of State Street Corporation – a bank where he was a managing director. ECF No. 34 at p. 12. The victims of the scheme were primarily pension funds. *Id.* Boomgaardt's offense level was 29, yielding an applicable guidelines range of 87 to 108 months. *Id.* at 1. After his waiver of extradition and indictment, and cooperation with the government, including trial testimony against a co-defendant, Boomgaardt was sentenced to one year of probation. ECF No. 37 at pp. 27-29; ECF No. 39.

- *United States v. Cooper Lee*, 19-Cr-00376-RS (N.D. Cal.): Lee pleaded guilty to one count of criminal conspiracy. ECF No. 100 at p. 3. After Lee's co-defendant raised $110 million from foreign investors seeking U.S. residency under the EB-5 visa program, Lee conspired to diverge those funds to personal enterprises and businesses controlled by his co-defendant. *Id*. at 2. Lee's offense level was 17 and his Criminal History category was II, yielding an applicable guidelines range of 27 to 33 months' imprisonment. *Id*. at 3-4. As a result of his participation in a post-plea interview with the government and given his limited role in the overall investment fraud scheme (which was largely orchestrated by his co-defendant), he was sentenced to 3 years of probation. *Id*.; ECF No. 102.

Like the above defendants, Mr. Shokouhi accepted responsibility and truthfully and extensively cooperated with the government in furtherance of its investigation. Mr. Shokouhi also has no prior criminal history – his conduct in this case was truly an aberration in an otherwise upstanding and exemplary life. Indeed, since his arrest in 2022, Mr. Shokouhi has been in full compliance with the terms of his release. (PSR ¶73.) These facts and circumstances, especially when combined with Mr. Shokouhi's current health issues (described in further detail immediately below), warrant a non-custodial sentence like the ones afforded in the above-cited cases, many of which had aggravating factors not present here.

**E.    Incarceration Would Be Disproportionately Punitive on Mr. Shokouhi Who Is Unlikely to Survive in Prison Due to His Complex Health Conditions**

A non-custodial sentence also strikes the right balance to provide Mr. Shokouhi with "needed… medical care… in the most effective manner." *See* 18 U.S.C. § 3553(a)(2)(D); *United States v. White*, 506 F.3d 635, 644 (8th Cir. 2007) (finding the "mandate" to consider a defendant's history and characteristics "includes consideration of a defendant's age and medical condition"). As recognized by Probation, Mr. Shokouhi "has several serious, chronic, and interdependent health conditions which



require an ongoing and extensive level of care." (PSR ¶174.) In light of these complex medical conditions, [redacted], Probation has recommended a ten-level downward variance. (PSR ¶177.)

As described above, [redacted]

[redacted]

[8] Exhibit B contains letters from Mr. Shokouhi's treating physicians as well as medical records that post-date the PSR. Mr. Shokouhi would be happy to provide further information regarding his current health issues if the Court has additional questions.

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF



Mr. Shokouhi's need for continued medical monitoring and treatment is significant and informative of how he should be sentenced. As Mr. Shokouhi's treating physician of over 20 years writes, "Akbar's medical needs are extensive, ongoing, and require a level of care and coordination that is unlikely to be met in a correctional facility. Any interruption in his current regimen or access to specialty care would pose a significant and immediate threat to his health and life." (Exh. B at p. 7). ██

Simply put, if Mr. Shokouhi is incarcerated, he is not likely to receive the medical care necessary to sustain his life.

First, Mr. Shokouhi will not be able to receive adequate care due to systematic deficiencies in the Bureau of Prisons' ("BOP") delivery of medical services evident through various inspections of BOP facilities in recent years. For example, a December 2024 Office of Inspector General ("OIG") report on Federal Medical Center Devens found numerous concerns related to the quality of healthcare provided to incarcerated individuals, including potentially dangerous medication distribution practices and a



backlog of outside medical visits that had yet to be scheduled.[9] ██████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████  ██████████████████████

████████████████████████████████████

████████████████████████████████ For an individual with so many health complications like Mr. Shokouhi, a fragmented and incomplete care regimen will simply not be sufficient to sustain his life.[12]

Additionally, given the reputation of BOP facilities as having "[a] lack of coherent, cohesive laws on food quality and quantity" and "unhealthy, and inhumane portions of food to be served day in and day out," it is unlikely that Mr. Shokouhi' s dietary needs – critical to his health – will be met.[13] ████████████████████████

---

[9] U.S. Dep't of Justice Office of the Inspector General, Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens (Dec. 2024), available at https://oig.justice.gov/news/doj-oig-releases-inspection-bops-federal-medical-center-devens.

[10] N. Rockey et al., *Challenging Health Inequities in Incarceration: a Call for Equitable Care for* ████████████████, 25 Current Hypertension Reports 427, 439 (2023), available at https://link.springer.com/article/10.1007/s11906-023-01267-z ("██ management requires frequent lab checks and titration of medications, and the availability of this care may be inadequate in prisons. For example, on-site testing and medical specialty care are inconsistently offered in prisons, with sites reporting a mix of on-site and off-site availability.")

[11] *Id.*

[12] As Mr. Shokouhi's treating physician writes, his health ████████████ ████████████████████████████████████████████████████ ████████████████

[13] Parisa Afsharian, *Beyond the Food: How Prison Nutrition Policy Contributes to Lasting Chronic Disease,* Brown Undergraduate Journal of Public Health (May 2, 2023) available at https://sites.brown.edu/publichealthjournal/2023/05/02/beyond-the-food-how-prison-nutrition-policy-contributes-to-lasting-chronic-disease/.

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF



) One of the easiest ways to get an infection is through unclean or undercooked foods.[14]

In June 2024, the OIG conducted an inspection of food services at BOP facilities around the country and found that half of the inspected facilities did not maintain adequate temperature in fridges and freezers which created a risk of "growth of harmful bacterial and organisms, increasing the risk of foodborne illness."[16] The inspection also found that some facilities did not have soap

---

[14] U.S. Dep't of Agriculture, Food and Drug Admin., *Food Safety for Transplant Recipients* (Sept. 2011), pp. 4-5, https://health.ucdavis.edu/transplant/PDFs/posttransplant/Food%20Safety%20For%20Transplant%20Recipients.pdf.

[15] *Id.* at pp. 8-10.

[16] U.S. Dep't of Justice Office of the Inspector General, *Concurrent Inspection of BOP Food Service Operations* (June 17, 2025), available at https://oig.justice.gov/reports/concurrent-inspections-bop-food-service-operations.

for inmates who prepared food and had food that was past the expiration date.[17] An inspection of a low-security facility in California found food in housing units that "contributed to an increased presence of rodents and other insects, creating unsanitary conditions."[18] Exposure to any of these food safety and sanitation issues could be lethal to Mr. Shokouhi.

Beyond adhering to food safety protocols, Mr. Shokouhi is also required to avoid large gatherings and crowded places and avoid contact with sick individuals (Exh. B at p. 2) – all of which would be impractical, if not impossible, in a prison setting. Mr. Shokouhi's treating physician writes that a "congregate living environment of a prison poses a substantial risk for exposure to infectious diseases, which could be catastrophic for [Mr. Shokouhi]." (Exh. B at p. 7.)

Third, incarceration is likely to lead to mismanagement of Mr. Shokouhi's medications. ███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ As reflected in a KidneyNews publication, patients who are incarcerated may not have control over their medications or when they are administered, which is especially concerning for inmates with ███████████████.[19] Additionally, the risk of medication errors or supply interruptions is generally higher in institutional settings. (Exh. B at p. 3.) ████

█████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████

---

[17] *Id.*

[18] *Id.*

[19] KidneyNews, Bridget Kuehn, *Incarceration Linked to Kidney Risk and Care Access Challenges* (March 1, 2024), available at https://www.kidneynews.org/view/journals/kidney-news/16/3/article-p20_10.xml?tab_body=fulltext.

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF



        In sum, Mr. Shokouhi suffers from numerous serious medical conditions that require significant and continued monitoring and treatment. He is also at an age where these conditions will invariably get worse. As his physician writes, given Mr. Shokouhi's medical complexity, his likelihood of surviving in a prison environment is "extremely low" as any interruptions in his care will pose an "immediate threat" to his life. (Exh. B at p. 3.) Accordingly, any period of incarceration will, at best, exacerbate his health conditions and, at worst, be tantamount to a life sentence. Under these circumstances, a non-custodial sentence would satisfy the broader goals of sentencing while also provide "the most effective" medical treatment for Mr. Shokouhi. *See United States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010) (affirming a non-custodial sentence because it allowed for "needed care in the most effective manner"); *United States v. Pinkey McFarlin*, 535 F.3d 808 (8th Cir. 2008) (affirming a sentence of three years of probation with home detention for defendant who had multiple heart surgeries, took 11 prescription medications daily, and had serious health issues, including high blood pressure, gout, and diabetes, where the guidelines range was 78 to 97 months.)

---

[20] N. Rockey *et al.*, *supra* note 10, at 439 ("[Y]et transplant is not readily available for most incarcerated individuals with advanced kidney disease. . . [M]any programs preclude incarcerated people from transplantation consideration, often in the absence of uniform criteria. Challenges to evaluation and listing that preclude listing may include the logistical hurdle of bringing prisoners to the hospital on short notice, ability to get routine testing done efficiently, and multiple barriers to follow up once out of prison.").

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

1

### F.     The Requested Sentence Achieves Adequate Deterrence

2

Another § 3553 factor is the need to "afford adequate deterrence from criminal

3

conduct." 18 U.S.C. § 3553(a)(2)(B). A custodial sentence is not the only way to

4

achieve such deterrence. Courts also recognize that non-custodial sentences can be

5

sufficiently punitive.

6

With regard to specific deterrence, there is no question that, well before this case

7

was filed and long before any sentence will be imposed, Mr. Shokouhi has already been

8

sufficiently deterred from any further law violations. As Probation notes, "[t]here is no

9

doubt that Shokouhi is now remorseful for his illegal conduct in the offense and plans

10

to remain law abiding in the future." (PSR ¶183). It is without question that Mr.

11

Shokouhi's guilty plea, <u>plus</u> his conviction, <u>plus</u> substantial financial loss personally

12

and to his business,[21] <u>plus</u> the reputational damage he has suffered, <u>plus</u> the mere

13

possibility of a guidelines sentence behind bars away from his wife, daughters, family,

14

and friends, are more than sufficient to deter Mr. Shokouhi from further unlawful

15

conduct. *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As to

16

specific deterrence, it seems obvious that, having suffered such a blow to his reputation,

17

[the defendant] is unlikely to repeat his transgressions, and no further punishment is

18

needed to achieve this result."). Moreover, as is demonstrated by Mr. Shokouhi's

19

personal history and lack of any other criminal conduct in his decades of business

20

dealings, he does not present a risk of recidivism that would require a sentence of

21

incarceration for purposes of deterring him from future unlawful conduct. Additionally,

22

his age and his serious health issues also indicate he is unlikely to reoffend. *See, e.g.*,

23

*United States v. Hernandez*, No. 03 Cr. 1257 (RWS), 2005 WL 1242344, at *5

24

---

25

[21] Since the indictment, Encore Semi, once Mr. Shokouhi's primary source of income, has been exponentially losing business. As a result of Encore's performance, Mr.

26

Shokouhi has not received any distributions from Encore since 2023.  And none of his other business ventures have been profitable either – Chronos, for example, has lost

27

money. (PSR ¶ 136; *see also* PSR ¶138 (noting how Business Strategic Advisors, LLC has not made any money since 2022).) Indeed, in order to pay his bills, Mr. Shokouhi

28

has been borrowing funds from a trust he established for his daughters.

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

(S.D.N.Y. May 24, 2005) (varying downward because "defendants . . . over the age of forty . . . exhibit markedly lower rates of recidivism in comparison to younger defendants"); *United States v. Wadena*, 470 F.3d 735, 740 (8th Cir. 2006) (varying down from 18-24 months to probation, in part, because "Wadena's age [of 67] and recent deterioration in his health reduce the risk of re-offending.").

Similarly, the combination of a sentence of time served and supervised release that curtails Mr. Shokouhi's liberty with the other collateral consequences of this case will provide adequate general deterrence to the public. Even before sentencing, the public humiliation resulting from a criminal indictment, conviction—and the media coverage of the same—is not only a heavy burden for Mr. Shokouhi but would also tend to discourage others from committing the same crimes. As other courts have noted, where "[t]he defendant has already suffered serious consequences," such as "publicity" of the case and "damage to [one's] reputation . . . the mere fact of the prosecution [already] sends a *compelling message of deterrence*." *United States v. Hoffmann*, 2006 WL 3390736, at *6 (D. Neb. Nov. 22, 2006), *aff'd*, 556 F.3d 871 (8th Cir. 2009) (emphasis added); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (noting the ruined reputation of the defendant following his conviction as a deterrent).

Moreover, the concepts of general deterrence also support incentivizing future defendants to respond as Mr. Shokouhi has when faced with allegations of wrongdoing. As described above, Mr. Shokouhi was the only defendant who voluntarily paid Qualcomm back over $5 million as part of a pre-litigation settlement. He also paid over $9 million in taxes on profits made from the Abreezio sale. When Mr. Shokouhi was indicted, he responsibly retained counsel and approached the government about a potential resolution, which ultimately led to his plea and extensive cooperation. *See United States v. Richard Boomgaardt*, 17-Cr-10167-DJC, ECF No. 37 at p. 29 (D. Mass. Aug. 3, 2018) (imposing a non-custodial sentence "as a measure or a notice to folks that are perhaps similarly situated . . . that the only way to come out from under

1  the prospect of a stiff sentence is by measures of extraordinary substantial assistance.")

2  Mr. Shokouhi's conduct shows that even prior to the indictment, he sought to do the

3  right thing. The Court should take this opportunity to encourage other defendants to

4  actively rectify their wrongdoing like Mr. Shokouhi, by imposing a sentence that

5  accounts for the affirmative steps he took to right a wrong and accept responsibility. In

6  sum, this is the rare case where the concepts of deterrence serve as mitigating factors

7  supporting a non-custodial sentence. Indeed, sentencing here can be used as a beacon to

8  show others exactly how a person should react when confronted with his own

9  wrongdoing.

10  ### G.    The Recommended Restitution of $16,084,946, Paid at No More

11  ### than $500 a Month, is Appropriate

12  Mr. Shokouhi respectfully submits that consistent with Probation's

13  recommendation and the terms of his plea agreement, the Court should impose

14  restitution in the amount of $16,084,946 because such an amount represents a fair and

15  appropriate calculation of restitution in this case to Qualcomm. (PSR ¶¶ 187, 200; ECF

16  No. 179-1 at p. 7). As noted above, Mr. Shokouhi already paid $5 million to Qualcomm

17  as part of a pre-litigation settlement agreement executed in January 2020, almost two

18  years *before* the indictment was unsealed in this case. He has also agreed to pay

19  approximately $6.6 million towards restitution prior to sentencing, (*see* Financial

20  Addendum, (ECF No. 179-1 at p. 1)) and has worked with the government to allow for

21  the interlocutory sale of his primary residence valued at approximately $11,500,000 to

22  satisfy this payment obligation. (ECF No. 497). This is in addition to the approximately

23  $1.4 million Mr. Shokouhi has agreed to apply towards restitution from his seized bank

24  accounts. (*Id.* at p. 8). It is important to note that the restitution calculation does not

25  include the approximately $9.8 million Mr. Shokouhi paid in taxes on the profits he

26  made from the Abreezio sale. Thus, by the time he is sentenced, Mr. Shokouhi will

27  have already paid millions of dollars more to Qualcomm and the government than he

28

Case 3:22-cr-01152-BAS    Document 529    Filed 02/02/26    PageID.16025    Page 35 of 37

1   personally made from the Abreezio sale.[22] This should be sufficient, especially given

2   that Mr. Shokouhi was Defendant No. 4 in an initial four-defendant case and, as the

3   indictment makes clear, he was the least culpable defendant.

4          Accordingly, Mr. Shokouhi respectfully submits that the proper amount of

5   restitution to be paid is $16,084,946. This amount will appropriately compensate

6   Qualcomm, especially when considered with the restitution to be paid by the other

7   defendants.[23]

8          Mr. Shokouhi's also incorporates herein his objections to Probation's suggested

9   restitution payment of $2,000 per month during supervised release (PSR ¶200), as this

10  amount does not properly account for Mr. Shokouhi's current financial circumstances,

11  including his lack of income from his businesses. As noted above, since his indictment,

12  Encore Semi (which used to be a primary source of income for him) has been

13  exponentially losing business and there is nothing to suggest that it will perform better

14  in the future. (*See* PSR ¶140 (noting that Mr. Shokouhi has not received any

15  distributions from Encore Semi since 2023).) As further detailed in the PSR, Mr.

16  Shokouhi's only source of income is the monthly rental income from his properties

17  totaling approximately $2,300 (after accounting for expenses), which supplements his

18  $1,695 monthly Social Security payment (after applying the Medicare deduction). (*See*

19  PSR ¶135.)[24] To provide for himself and his wife, including the payment of his medical

20

21
    _____

22  [22] As noted above, Mr. Shokouhi personally received a little over $21 million from the
    sale of Abreezio. When $9.8 million is subtracted from that amount, that leaves
23  approximately $11 million.

24  [23] The court ordered Mr. Taneja to pay restitution in the amount of $10,046,571.82.
    (ECF No. 524). The court also ordered Mr. Arabi to pay $100 million in restitution.
25  (ECF No. 490). While Mr. Shokouhi recognizes that the court ordered that all
    defendants be jointly and severally liable for this amount, he respectfully submits that
26  he should only be ordered to pay $16,084,946. This would be commensurate with Mr.
    Shokouhi's role in the offense as well as account for his other mitigating conduct, as
27  described herein.

28  [24] Given Mr. Shokouhi's age and complex medical history, Mr. Shokouhi does not
    anticipate that he will be able to work again. (PSR ¶121.)

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

expenses, Mr. Shokouhi has been borrowing funds from the trust account he has established for his daughters. As of July 2025, there was $3,865 left in the trust. (PSR ¶151 (see fourth account listed).)

Although Mr. Shokouhi's assets may not seem insignificant on paper, in November 2025, consistent with the parties' stipulation, this Court ordered the Interlocutory Sale of Mr. Shokouhi's primary residence, which accounts for the majority of his assets and was the only property Mr. Shokouhi owned outright. (PSR ¶151; ECF No. 497.) As such, a $2,000 monthly restitution payment will be a significant burden on Mr. Shokouhi, especially when considered with his ever-present medical expenses. Accordingly, Mr. Shokouhi respectfully requests that his monthly restitution payment be lowered to no more than $500 per month (or even lower, given the uncertain circumstances).

Considering the financial picture described above, Mr. Shokouhi also respectfully submits that he should be permitted to use a portion of the proceeds from the interlocutory sale of his home to pay the capital gains tax (which will likely amount to over a million dollars) that will result from that sale.  To be clear, Mr. Shokouhi is only seeking to use a portion of the proceeds that remain *after* he satisfies the approximately $6.6 million that he has agreed to pay towards restitution prior to sentencing. Mr. Shokouhi does not make this request lightly, but having to pay over a million dollars in capital gains tax – on top of his restitution and forfeiture obligations – will be devastating to him and his family, both financially and emotionally. Respectfully, this request should not be viewed as taking money away from Qualcomm, since Qualcomm will still be made whole through scheduled restitution payments. Additionally, as explained above, at the time of his sentencing Mr. Shokouhi's will have already paid or be set to pay approximately $13 million to Qualcomm.

DEFENDANT ALI AKBAR SHOKOUHI'S SENTENCING BRIEF

## IV.    A FINE SHOULD NOT BE IMPOSED, CONSISTENT WITH THE TERMS OF THE PARTIES' PLEA AGREEMENT

Finally, as detailed in Mr. Shokouhi's objections to the PSR, Mr. Shokouhi respectfully submits that, consistent with the terms of the Plea Agreement and, in light of Mr. Shokouhi's role in the offense, his acceptance of responsibility (and cooperation), the substantial forfeiture and restitution amount he has agreed to pay in this case, and his health and financial circumstances this Court should not impose a fine. *See* Plea Agmt. (ECF No. 179 at p. 11) ("In light of the forfeiture and restitution to be imposed, the parties will jointly recommend that the Court not impose a fine."); U.S.S.G. § 5E1.2(d) (In determining the fine, the court must consider, among other things, the "need for the combined sentence to reflect the seriousness of the offense [], to promote respect for the law, [and] to provide just punishment and to afford adequate deterrence," as well as "any restitution or reparation that the defendant has made or is obligated to make.").

## V.    CONCLUSION

An appropriate assessment of Mr. Shokouhi over the course of his entire life and not just the aberrant circumstances that brought him before this Court, shows that a sentence of time served and one year of supervised release is sufficient, but not greater than necessary, to adequately reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter criminal conduct.

DATED: January 30, 2026        By: */s/ David K. Willingham*
_____
KING & SPALDING LLP
DAVID K. WILLINGHAM
JAMIE A. LANG

*ATTORNEYS FOR DEFENDANT*
*ALI AKBAR SHOKOUHI*